UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION No.

| | |
|---|---|
| NEW CINGULAR WIRELESS PCS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE CITY OF WALTHAM, THE CITY OF | ) |
| WALTHAM CITY COUNCIL, Edmund P. | ) |
| Tarallo, Sarafina Collura, David H. Marcou, Jr., | ) |
| Diane P. LeBlanc, Paul J. Brasco, Kathleen B. | ) |
| McMenimen, Thomas M. Stanley, Daniel P. Romard, | ) |
| George A. Darcy, III, Stephen F. Rourke, | ) |
| Thomas J. Curtin, Gary J. Marchese, Robert J. Waddick, | ) |
| Robert G. Logan, and Joseph M. Giordano, Jr., in their | ) |
| capacities as Members of the Waltham City Council, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## VERIFIED COMPLAINT

This action arises out of the unlawful animosity toward Plaintiff's requests to make minor modifications to its existing wireless facilities that has now been repeatedly demonstrated by the City of Waltham (the "City") and its City Council (the "City Council") (collectively, the "Defendants"). Defendants' intentional delays in accepting, reviewing, considering and rendering decisions with respect to Plaintiff's several applications to improve its existing wireless communications facilities are in clear violation of Section 704 of the Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c) (the "TCA").

Specifically, the Defendants' actions and failures to act violate the TCA's prohibition against unreasonable delay with respect to personal wireless service facilities siting requests. Over a period of more than eight months, Plaintiff has sought special permits to allow minor

modifications to its existing facilities within the City.  The modifications are intended to provide additional wireless broadband services to Plaintiff's subscribers.

Rather than assist Plaintiff's effort to provide important additional wireless services to the City and its residents, Defendants have erected a series of procedural impediments, each in violation of Defendants' unambiguous obligations under federal law.  In a concerted effort to avoid consideration of Plaintiff's modification requests, Defendants have, among other things: refused to consider Plaintiff's applications to modify its existing facilities until a series of wholly irrelevant City departments have signed off (one-by-one) on those applications; limited the number of modification requests that it would contemporaneously consider; found fault with public hearing notices modeled on the City's own examples; tabled consideration of Plaintiff's applications without cause; and, ultimately, manufactured literally scores of purported deficiencies with respect to those applications that have no bearing on their merits.  The length to which Defendants have gone to delay minor modifications to existing wireless facilities in the absence of any community opposition reflects Defendants' extreme and irrational hostility to wireless communications providers and is flatly illegal under federal law.

### A.    PARTIES

1.      New Cingular Wireless PCS, LLC ("AT&T") is a Delaware limited liability company with a principal place of business in Atlanta, Georgia.  It is licensed to conduct business in the Commonwealth of Massachusetts and operates wireless communications facilities throughout the Commonwealth.  It is an indirectly-wholly owned subsidiary of AT&T Inc., which, through its operating subsidiaries, provides wireless communications services nationwide.

2.      The City is a duly authorized municipality constituted and existing under the laws of the Commonwealth of Massachusetts.

3.      The City Council is a duly authorized unit of the City that has been delegated the authority under the Zoning Ordinance of the City of Waltham (the "Ordinance" or "Zoning Ordinance") to, among other things, approve applications for special permits for wireless telecommunication facilities.

4.      The defendants Edmund P. Tarallo, Sarafina Collura, David H. Marcou, Jr., Diane P. LeBlanc, Paul J. Brasco, Kathleen B. McMenimen, Thomas M. Stanley, Daniel P. Romard, George A. Darcy, III, Stephen F. Rourke, Thomas J. Curtin, Gary J. Marchese, Robert J. Waddick,  Robert G. Logan, and Joseph M. Giordano, Jr., are each residents of the City and together serve as the City Council that is the special permit granting authority responsible for deciding AT&T's special permit applications.

## B.    JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically 47 U.S.C. § 332(c)(7)(B). This action may also be maintained under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (the "Declaratory Judgment Act") because an actual controversy exists between the Plaintiff and the Defendants.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b), because the Defendants each reside in this District, and the events and/or omissions giving rise to this action occurred in this District.

## C.    FACTS COMMON TO ALL COUNTS

**AT&T and Broadband Technology**

7.      AT&T provides wireless voice and data products and services to customers nationwide, including "personal wireless services" within the meaning of Section 332 of the

TCA. 47 U.S.C. § 332. AT&T's wireless coverage reaches in excess of 300 million people, while its "3G" network—which allows customers access to the Internet, e-mails, and streaming music and videos—currently reaches approximately 233 million people.

8.     Unlike cellular services using analog-based systems, digital technology converts voice or data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions. This allows AT&T to offer services unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data, paging and imaging capabilities, as well as voice mail, call forwarding and call waiting.

9.     The licenses authorizing AT&T to provide wireless service in the City were issued by the FCC pursuant to 47 U.S.C. § 151. Section 151 establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151. To meet these policy goals, AT&T seeks to provide personal wireless services to local businesses, public safety entities, and the general public. To advance the national policies enumerated under 47 U.S.C. § 151, AT&T must create and maintain a network of "cell sites," each of which consists of antennas and related equipment designed to send and receive radio signals.

10.     AT&T must constantly update its technology and expand its network to respond competitively by keeping up with customers' ever-growing demand for mobile services, including mobile data services.

11.     In accordance with its FCC licenses, AT&T is in the process of upgrading its existing wireless communications facilities to provide services commonly referred to as long term evolution ("LTE") in the 700 and 2100 MHz frequencies.

12.     LTE is a wireless broadband technology designed to support mobile Internet access through the use of cell phones and handheld devices.  Specifically, LTE will be used to enhance AT&T's high speed data services.

13.     At present, AT&T has no LTE coverage anywhere in Massachusetts.  Because of the large number of AT&T users within the City and its geographic location, the City, along with Boston, Woburn, and several other large cities in Massachusetts, was selected by AT&T to be among the first areas for LTE upgrades.

14.     AT&T can provide LTE services through minimal upgrades to its existing cell sites, which generally include the replacement of existing antennas or addition of three (3) panel antennas, and the installation of associated antenna ground equipment within existing equipment cabinets.  To the maximum extent possible, AT&T is seeking to install the enhanced LTE network at existing AT&T sites and facilities to avoid the need to construct new tower sites.

**Federal Regulation of Wireless Telecommunications Facilities**

15.     Broadband technology such as LTE is of critical importance to the nation's wireless infrastructure.  In 2009, Congress passed the American Recovery and Reinvestment Act of 2009 (the "Recovery Act"), which directed the FCC to create a national broadband plan (the "Plan") by February 2010.  American Recovery and Reinvestment Act of 2009, Pub L. No. 115-5, Title II, 14.  The stated purpose of the Plan is to ensure that all Americans "have access to broadband capability and [] establish clear benchmarks for meeting that goal."  Id. at § 6001(k).

16.     The Plan emphasizes the importance of broadband technology: "[l]ike electricity a century ago, broadband is a foundation for economic growth, job creation, global competitiveness and a better way of life." Federal Communications Commission, Connecting America: The National Broadband Plan XI (2009).  As the FCC noted, although "the American broadband ecosystem has evolved rapidly . . . broadband in America is not all it needs to be." Id.

17.     The mission of the National Broadband Plan is "to create a high-performance America--a more productive, creative, efficient America in which affordable broadband is available everywhere and everyone has the means and skills to use valuable broadband applications." Id. at 9.  To achieve its ends, the Plan contains time-sensitive metrics.

18.     As the FCC has noted:

> approximately 100 million American do not have broadband at home.
> Broadband-enabled health information technology (IT) can improve care
> and lower costs by hundred of billions of dollars in the coming decades,
> yet the United States is behind many advanced countries in the adoption of
> such technology.  Broadband can provide teachers with tools that allow
> students to learn the same course material in half the time, but there is a
> dearth of easily accessible digital educational content required for such
> opportunities.  A broadband-enabled Smart Grid could increase energy
> independence and efficiency, but much of the data required to capture
> these benefits are inaccessible to consumers, businesses and entrepreneurs.
> And nearly a decade after 9/11, our first responders still lack a nationwide
> public safety mobile broadband communications network, even though
> such a network could improve emergency response and homeland
> security.

http://www.broadband.gov/plan/executive-summary/ (last accessed July 22, 2011).

19.     The Recovery Act is the most recent federal statute governing AT&T's efforts to provide LTE's broadband services.  However, AT&T's activities are also protected by the provisions of the TCA, which Congress enacted in 1996 to "encourage the rapid deployment of new telecommunications technologies." TCA, 110 Stat. 56.  Section 704 of the TCA, 47 U.S.C. § 332(c), governs federal, state and local government regulation of the siting of "personal

wireless service" facilities such as those proposed by AT&T.  47 U.S.C. § 332(c)(7)(B) provides, among other things, that:

> (ii)   A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless services **within a reasonable period of time** after the request is duly filed with such government or instrumentality, **taking into account the nature and scope of such request**.

47 U.S.C. § 332(c)(7)(B)(ii) (emphases added).

20.     The TCA further provides that any person adversely affected by a state or local government's action or failure to act that is inconsistent with Section 332(c)(7) is entitled to expedited review in the reviewing court.  47 U.S.C. § 332(c)(7)(B)(v).

21.     To promote the timely deployment of broadband – including LTE – by reducing delays in the construction and improvement of wireless networks, the FCC issued an important declaratory ruling in November of 2009 clarifying the "reasonable time" standards set forth in the TCA.  See November 18, 2009 Declaratory Ruling, In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance, WT Docket No. 08-165 (the so-called "Shot Clock Ruling").

22.     In its Shot Clock Ruling, the FCC noted that "[i]n many cases, delays in the zoning process have hindered the deployment of new wireless infrastructure." Id. at p. 1.  The FCC also noted that "[d]elays in the processing of personal wireless service facility siting applications are particularly problematic as consumers await the deployment of advanced wireless communications services, including broadband services, in all geographic areas in a timely fashion." Id. at p. 14.

23.     The Shot Clock Ruling attempts to address these problems by setting forth presumptively reasonable time periods beyond which inaction on a siting application constitutes a "failure to act" under the TCA.  With respect to requests for the collocation of equipment on an existing wireless telecommunications facility, the presumptively reasonable time in which a municipality should render a decision on an application is 90 days.  Id. at p. 2.  If an application seeks to construct a new tower or other wireless telecommunications facility rather than collocation on an existing facility, the presumptively reasonable time for making a decision on an application is 150 days.

24.     Additionally, during the first 30 days following receipt of an application, municipalities may toll the running of the Shot Clock if they notify the applicant that the application is incomplete.   The FCC stated that:

> a review period of 30 days gives State and local governments sufficient time for reviewing applications for completeness, while protecting applicants from a last minute decision that applications should be denied as incomplete.  Accordingly, we conclude that the time it takes for an applicant to respond to a request for additional information will not count toward the 90 or 150 days only if that State or local government notifies the applicant within the first 30 days that its application is incomplete.

Id. at p. 22.

25.     With respect to the 700 MHz band, the FCC has "adopted stringent build out requirements to ensure the rapid and widespread deployment over this spectrum.  State and local practices that unreasonably delay the siting of personal wireless service facilities threaten to undermine the achievement of the goals that the Commission sought to advance in those proceedings.  Moreover, they impede the promotion of advanced services and competition that Congress deemed critical in the Telecommunications Act of 1996 and more recently in the Recovery Act."  Id. at pp. 14-15.

**AT&T's Applications in Waltham**

26.     To deploy its LTE network in the City, AT&T needs to make minor upgrades to its eight existing wireless communications facilities.  The eight existing AT&T sites are at the following addresses in the City:  404 Wyman Street ("Wyman"), 101 Clematis Avenue ("Clematis"), 37 River Street ("River"), 15/39 Sachem Street ("Sachem"), One Moody Street ("Moody"), 1050 Winter Street ("Winter"), 130 Turner Street ("Turner"), and 46/50R Bear Hill Road ("Bear Hill").  For six of the eight sites, existing antennas are simply being replaced by new antennas – the wireless equivalent of changing a light bulb.  For the remaining two sites, AT&T seeks to add additional antennas to those now existing.  At each of the eight sites, accessory equipment to the antennas, including, without limitation, remote radio heads and surge arrestors, will be installed as depicted on the plans submitted with the applications, and additional equipment cabinets will be located inside an already existing equipment shelter or equipment room.

**The City's Handling of Plaintiff's Requests to Make Minor Modifications**

27.     Section 10.56 of the City's Zoning Ordinance provides that "[m]odification or addition of wireless communication equipment . . . will require a special permit by the City Council in accordance with Section 3.5."

28.     Since at least October of 2009, the City of Waltham Building Inspector has consistently taken the position that **any** modifications of a wireless telecommunications facility, no matter how minor, require a special permit from the City Council.

29.     Under the Ordinance, all special permits are subject to a lengthy pre-application procedure that requires applicants to first submit an official development prospectus ("Prospectus") containing sign-offs from numerous City officials and entities.

30.    Specifically, Section 3.5 of the Zoning Code provides, in relevant part, that:

Property owners desiring to obtain a special permit from the City Council authorized elsewhere within this chapter for either use or intensity of use purposes shall file application for the same with the City Clerk. Each application shall be accompanied by one original development prospectus, fully prepared, together with 20 copies of said development prospectus.

31.    For each of the eight sites at which improvements were contemplated, AT&T is required to obtain the following approvals relative to each Prospectus:

– Signature of Building Inspector relative to Zoning Ordinance compliance;

– Signature of Director of Public Health relative to State Sanitary Code compliance;

– Signature of City Engineer relative to Subdivision Control Compliance;

– Signature of Building Inspector regarding on-site engineering elements;

– Signature of City Engineer relative to the water system;

– Signature of City Engineer relative to the sewer system;

– Signature of City Engineer relative to the drainage system;

– Signature of Chairman of the Conservation Commission regarding any wetlands problems;

– Signature of Building Inspector regarding whether the project is in an area zoned as "Wetlands, etc.";

– Signature of Building Inspector regarding whether the area is in an area zoned as "Floodplains and floodways";

– Signature of the Superintendent of Schools relative to educational costs;

– Signature of Director of Recreation relative to recreational costs;

– Vote of the Traffic Commission relative to the proposal;

– Verification of the Public Works Director regarding water, sewer, and trash;

– Verification of the Conservation Commission relative to pollution of any body of water or waterway;

- Signature of City Engineer regarding impact on storm drainage system;

- Confirmation by Building Director, City Engineer, Superintendent of Schools, Director of Recreation, Public Works Director, Police Chief, Fire Chief relative to financial impact; and

- Confirmation by the Waltham Historical Commission relative to any historical significance or lack thereof of the proposed site or structure.

32.     The vast majority of these sign-offs are wholly irrelevant to the original special permits that authorized wireless communications uses at the subject properties, and have literally no relevance to the minor modifications now being proposed by AT&T.  A true and accurate copy of the Prospectus for Wyman, which is a representative example of the Prospectuses, is attached hereto as Exhibit A.

33.     Inexplicably, and further exacerbating the delay, the City requires the applicant to deliver the Prospectus to one department at a time rather than seeking all signatures simultaneously.  Once a signature is received from a particular department, the applicant then has to go to City Hall, collect the Prospectus, and deliver it to a different department.

34.     AT&T began the process of collecting signatures for the Prospectuses **eight months ago**, on November 8, 2010.  When AT&T later made minor modifications to its plans, AT&T had to start the Prospectus process all over again.

35.     The delays engendered by the City's Prospectus requirement are substantial, and are clearly reflected in dates upon which AT&T received pre-application sign-offs for its various sites:

| | Bear Hill | Turner | Moody | Clematis | Winter | Sachem | River | Wyman |
|---|---|---|---|---|---|---|---|---|
| **Department** | | | | | | | | |
| Public Health | 11/8/2010 | 11/8/2010 | 11/8/2010 | 11/8/2010 | 11/8/2010 | 11/8/2010 | 11/8/2010 | 11/8/2010 |
| Police | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 |
| Traffic | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 11/10/2010 |
| Conservation | 11/18/2010 | 11/18/2010 | 11/18/2010 | 11/18/2010 | 11/18/2010 | 11/18/2010 | 11/18/2010 | 11/18/2010 |
| | | | | | | | | |
| **Restart Following Plan** | | | | | | | | |

| Revision | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Historical | 12/13/2011 | 12/13/2011 | 12/13/2011 | 12/13/2011 | 12/13/2011 | 12/13/2011 | 12/13/2011 | 12/13/2011 |
| Conservation | 12/16/2011 | 12/16/2011 | 12/16/2011 | 12/16/2011 | 12/16/2011 | 12/16/2011 | 12/16/2011 | 12/16/2011 |
| Traffic | 12/29/2011 | 12/29/2011 | 12/29/2011 | 12/29/2011 | 12/29/2011 | 12/29/2011 | 12/29/2011 | 12/29/2011 |
| Police | not dated | not dated | not dated | not dated | not dated | not dated | not dated | not dated |
| Public Works | 1/14/2011 | 1/14/2011 | 1/14/2011 | 1/14/2011 | 1/14/2011 | 1/14/2011 | 1/14/2011 | 1/14/2011 |
| Fire | 1/21/2011 | 1/21/2011 | 1/21/2011 | 1/21/2011 | 1/21/2011 | 1/21/2011 | 1/21/2011 | 1/21/2011 |
| Recreation | 1/28/2011 | 1/28/2011 | 1/28/2011 | 1/28/2011 | 1/28/2011 | 1/28/2011 | 1/28/2011 | 1/28/2011 |
| Schools | 2/7/2011 | 2/7/2011 | 2/7/2011 | 2/7/2011 | 2/7/2011 | 2/7/2011 | 2/7/2011 | 2/7/2011 |
| Public Health | 2/9/2011 | 2/9/2011 | 2/9/2011 | 2/9/2011 | 2/9/2011 | 2/9/2011 | 2/9/2011 | 2/9/2011 |
| Building | Not yet received | 4/26/2011 | 2/28/2011 | 2/24/2011 | 6/2/2011 | 3/21/2011 | 3/21/2011 | 2/16/2011 |
| Engineering | Not yet received | 5/10/2011 | 3/9/2011 | 3/9/2011 | 6/22/2011 | 4/6/2011 | 4/6/2011 | 3/11/2011 |
| Special Permit Application Date | 7/1/2011 | 7/1/2011 | 5/17/2011 | 5/3/2011 | 7/1/2011 | 5/3/2011 | 5/3/2011 | 5/17/2011 |

36.     The lengthy delays associated with this process are clear.  For example, to date, AT&T has not received the sign off from the Building Department or the Engineering Department with respect to the Bear Hill site.  The Building Department has had the Bear Hill plans since February 9, 2011.  July 9, 2011 marks the 150th day that the Bear Hill Plans have been trapped in the Building Department.  To put this magnitude of this delay into perspective, 150 days is the **total** amount of time that is presumptively reasonable under the Shot Clock for a municipality to decide on an application **to build an entirely new tower**.

37.     Requiring AT&T to go through the Prospectus process is entirely inconsistent with the goals of the TCA, most specifically the rapid deployment of new telecommunications technologies, and the timing of the Shot Clock (90 days for a collocation application and 150 days for a new tower).

38.     Here, AT&T's applications are for mere modifications of existing cell sites, yet the shortest amount of time for the pre-application Prospectus process was the 121 day period for the Moody and Clematis sites.

**The City's Staggered Application Demand**

39.     On April 13, 2011, Michelle Neville ("Ms. Neville") from the City Clerk's office emailed a sample notice of public hearing to AT&T's counsel.

40.     On April 28, 2011, AT&T's counsel emailed five completed notices of public hearing to Ms. Neville at the City Clerk's office and indicated that the applications would be filed the following morning.

41.     However, when AT&T attempted to file the special permit applications for the Moody, Clematis, Sachem, River, and Wyman Sites on April 29, 2011, Ms. Neville informed AT&T's representative that he needed an appointment with Rosario Malone ("Mr. Malone"), the City Clerk, to file the applications.

42.     At the May 3, 2011 meeting with Mr. Malone, although all five applications were ready for filing, Mr. Malone permitted AT&T to file only three of the five applications: Clematis, River, and Sachem.

43.     In fact, AT&T had to persuade Mr. Malone to accept three applications rather than two.

44.     Mr. Malone indicated that he would allow AT&T to file the two remaining applications in a week or two.

45.     Mr. Malone also stated that AT&T would receive a request for an extension of the time for making a decision from the City Council and would be expected to agree to it.

46.     Two weeks later, on May 17, 2011, AT&T's representatives met again with Mr. Malone, who permitted AT&T to file the fourth and fifth applications – Moody and Wyman.

**The City Council's Hearings**

47.     The public hearing on the first three AT&T applications – Clematis, River and Sachem – was scheduled for May 23, 2011.  A true and accurate transcript of the May 23, 2011 hearing is attached hereto as Exhibit B.

48.     However, before the hearing could begin, two City Councilors raised objections to the public notices of the hearings.

49.     First, Councilor Curtain objected to the public notice, stating that the applications were not properly before the City Council because the public notices did not include a reference to the installation of an emergency 911 global positioning system ("GPS") antenna.   Councilor Curtain also complained that there was no reference to the zoning change sought.

50.     AT&T is seeking neither a GPS antenna nor a zoning change in connection with its application.

51.     Secondly, Councilor Tarallo stated that the public notices were deficient because the notice did not contain a reference to the specific section of the Ordinance under which AT&T was seeking zoning relief.  Councilor Tarallo stated that all applicants were required to include the specific section of the Ordinance and suggested that AT&T withdraw its application for zoning relief and refile.

52.     The President of the City Council, Councilor Brasco, concurred that the matters were not properly before the City Council and ruled them out of order.

53.     AT&T's representative had no opportunity to address either issue before the ruling was made, but objected nonetheless.  AT&T explained to Councilor Brasco that AT&T was not proposing the installation of an E911 GPS antenna as part of this modification and that any notification of same would be factually incorrect.  AT&T also took issue with Councilor

Tarallo's assertion that the notice was improper, because the notices clearly indicated that the relief requested was a special permit.

54.     Councilor Tarallo suggested that the City Council move that AT&T withdraw the pending applications, but AT&T did not agree to do so.  AT&T stated that if necessary, the public notices would be amended, but noted that the form provided by the City Clerk did not include any specific numbered reference to the Ordinance like that the City Council was now seeking.

55.     Councilor Tarallo then stated that there was sufficient basis to deny the applications immediately, but rather deny the application and face an immediate federal suit, raised an additional procedural hurdle by moving to table the applications and seek guidance from the City Solicitor's office.

56.     The President of the City Council, Councilor Brasco, ruled that the motion to refer the matter to the City Solicitor's office was non-debatable.

57.     Neither the Ordinance nor Massachusetts law requires that the specific section of the zoning ordinance be contained in the notice to abutters and/or publication in the newspaper.

58.     Furthermore, the sample form of notice provided by the City Clerk's office appears to have been used by another provider of functionally-equivalent wireless services and did not contain a specific reference to the Ordinance, contrary to the statements of Councilor Tarallo.  A true and accurate copy of such notice is attached hereto as Exhibit C.

59.     On May 24, 2011, counsel for AT&T sent John B. Cervone, the City Solicitor, a letter setting forth AT&T's position with respect to the adequacy of the notices.  AT&T's counsel, nevertheless, offered to work with the City and re-notice the hearings, and indicated that AT&T "stands ready to appear at public hearings at any time, including special meetings, until

these applications are fully processed to a decision." A true and accurate copy of the letter is attached hereto as <u>Exhibit D</u>.

60.     On May 25, 2011, counsel for AT&T made a follow up phone call to the City Solicitor's office to confirm receipt of the letter and to press for a response given the long delays already experienced by AT&T. The Assistant City Solicitor who handles special permits, Patricia Azadi, confirmed receipt of the letter, but informed AT&T's counsel that the City Solicitor's office does not respond to inquiries from outside parties. She then stated that the City Solicitor's office had not received any questions from the City Council, but that she expected that the City Clerk would transmit the questions from the City Council in due course and that her office would respond to the City Council or, if authorized, confer with us.

61.     On June 1, 2011, the City Solicitor, John B. Cervone, sent a letter to AT&T's counsel in which he confirmed that his office "gives legal advice and opinions to City of Waltham officials only not to other parties or their attorneys." After criticizing the "very palpable 'tone' of correctness or maybe 'entitlement' in your letter [that] perhaps obscures sight of a key issue that is likely 'jurisdictional' (perhaps fatally)," he suggested that AT&T should err on the side of caution. A true and accurate copy of the June 1, 2011 letter is attached hereto as <u>Exhibit E</u>.

62.     AT&T had, of course, already informed the City Council that it would re-notice the hearings if necessary, despite the absence of any legal requirement to do so.

63.     To date, AT&T is not aware that the City Solicitor has ever actually received inquiries from or responded to the City Council regarding the sufficiency of the notices.

64.     Although the City Council raised issues with the notice, with respect to the first three applications, which involved adding three additional antennas, the City did not identify **any** deficiencies in the applications.

**The City's Response to the Shot Clock**

65.     After the 30 day period for identifying any deficiencies with respect to the applications under the FCC's Shot Clock Ruling had elapsed, AT&T's counsel sent a letter to the City Counsel dated June 6, 2011.  In that letter, AT&T reminded the City of the applicable 90 period for a decision on the three initial applications and otherwise reserved its rights.  A true and accurate copy of the June 6, 2011 letter is attached hereto as <u>Exhibit F</u>.

66.     Seven days later, on June 13, 2011, the City Council held the initial public hearing on the fourth and fifth applications  (Wyman and Moody), which were filed on May 17, 2011.  A true and accurate transcript of the June 13, 3011 hearing is attached hereto as <u>Exhibit G</u>. Councilor Tarallo immediately arose claiming that there were fifty deficiencies in the Wyman application and sixty-eight deficiencies in the Moody application and opined that as a result, those applications were not complete.

67.     The applications for Wyman and Moody were substantially identical to the first three applications, for which **no** deficiencies were identified by the City Council.

68.     Upon information and belief, once informed of the Shot Clock Ruling's tolling provision, Councilor Tarallo and/or the City Solicitor's office manufactured deficiencies in the Wyman and Moody applications in an effort to toll the Shot Clock.

69.     The City Council then continued the public hearings until June 27, 2011 over AT&T's objection.

70.     AT&T had not been notified of any purported deficiencies in the applications in advance of the public hearing.

71.     Instead, these purported deficiencies were identified in letters dated June 14, 2011. True and accurate copies of the June 14, 2011 letters are attached hereto as Exhibits H and I.

72.     Almost none of the purported deficiencies identified by the City are substantive in nature. Many are simply ridiculous, and are clearly interposed for purposes of delay. For example, the City:

–   noted that the first page of the Prospectus should give the complete legal name of the applicant (despite the fact that the complete legal name of the applicant was indicated in numerous places in the application);

–   complained that Section VIII.E, subsections 8 and 9 did not contain dollar amounts and indicated that they should, even if the amount was zero (despite the fact that those sections were completed by City employees, not AT&T);

–   complained that the general description of the project said "see attached" without indicating what was attached;

–   noted that there was no copy of the Traffic Commission's vote attached to the statement discussing the Traffic Commission's vote on the proposal (with respect to a project that generates little traffic and for which there was no written vote);

–   complained about a signature and not knowing in what capacity the signer signed (even though it was expressly stated in the body of the letter that the signatory was signing in the capacity of landlord);

–   requested clarification that the plans provide conflicting information about the top of the parapet being noted as 71.34' and 71'4" (even though 71.34' would equal 71'4" when rounded to the nearest inch); and

     &minus;    objected to AT&T's failure to include a development schedule showing the proposed start time and completion date (which would be nothing but wishful thinking on AT&T's part given the unreasonable delay).

73.     Also at the June 13, 2011 meeting, Councilor Tarallo stated that the applications for Clematis, Sachem, and River should be continued because the City Council had not received the information purportedly requested from the City Solicitor's office, presumably related to the public notice "issue." Interestingly, the City Solicitor's office appeared to have adequate time to assist in the preparation of the application deficiency letters described above in paragraph 71.

74.     On June 27, 2011, in advance of the continued hearing, AT&T submitted lengthy responses to the purported deficiencies in the Moody and Wyman applications. True and accurate copies of the June 27, 2011 responses are attached hereto as <u>Exhibits J</u> and <u>K</u>

**The City Council's June 27 Farce**

75.     At the June 27, 2011 hearing, Councilor Tarallo moved to table the hearings on Moody and Wyman and submit AT&T's responses to the City Solicitor for a determination of completeness. A true and accurate copy of the transcript of the June 27, 2011 hearing is attached hereto as <u>Exhibit L</u>.

76.     Although there had been no formal determination relative to the adequacy of the public notices (an issue purportedly referred to the City Solicitor) and with no prior notice to AT&T, Councilor Tarallo then moved to take the Clematis, River, and Sachem applications off of the table.

77.     The City Council then asked numerous questions, the answers to some of which AT&T's representative indicated that AT&T would have to provide after the hearing. AT&T did so on July 1, 2011. Councilor Tarallo also inquired about whether AT&T had prepared draft decisions. AT&T offered to provide draft decisions forthwith and did so on July 1, 2011.

78.     Although AT&T had previously been given a list over a hundred purported deficiencies with respect to the Moody and Wyman applications, with respect to Clematis, River, and Sachem, in advance of the June 27, 2011 public hearing, AT&T was not informed that there was any additional information needed or that the purported issues relating to the adequacy of the public notice had been resolved.

79.     Immediately following the conclusion of the June 27, 2011 City Council meeting, at 12:45 a.m. on June 28, 2011, the City Council's Ordinance and Rules Committee (the "Committee") met.   A true and accurate copy of the transcript of the June 27, 2011 City Council meeting is attached hereto as Exhibit M.

80.     At the Committee meeting, Councilor Tarallo, who chairs the Committee, again inquired whether AT&T had prepared draft decisions for the City Council's review.

81.     Because the Committee met right after the City Council meeting at which the decisions were requested (following weeks of silence on whether the public hearing would even be allowed to proceed), AT&T did not yet have draft decisions but again offered to provide any information that Committee sought and did so on July 1, 2011.

82.     With respect to the Clematis, River, and Sachem applications, the Committee asked AT&T to extend the Shot Clock deadlines, claiming that in the absence of the draft decisions they did not have everything they needed to make their decisions.

83.     AT&T offered to provide the draft decisions and any other material and meet with the Committee at any point, but the Committee's position was that they were going on their summer break and would not meet again until August 1, 2011.

84.     Notwithstanding their claims that the Committee needed draft decisions to act, the Committee voted to recommend denial of AT&T's applications, and Tarallo indicated that he would have the law department prepare that decision.

85.     In the course of the "hearings" held to date, no one, including abutters, has spoken in opposition to any of AT&T's proposed modifications.  AT&T knows of no public opposition to the proposed modifications other than that reflected by the unlawful conduct of the City and the City Council.

86.     On July 1, 2011, AT&T provided draft decisions and responded to any outstanding questions for each of the three sites for which hearings had been held, Clematis, River, and Sachem.

87.     The filings on July 1, 2011 provide the City with over thirty days for review prior to the August 1, 2011 meeting of the City Council.

88.     On July 7, 2011, AT&T's counsel also submitted a letter relative to the Sachem site in light of concerns raised at the hearing on June 27, 2011 regarding its appearance. AT&T's counsel visited the site after the hearing, observed no litter, refuse, or excess equipment, and enclosed pictures from the June 1, 2011 visit to the Sachem site with the letter.

89.     Additionally, in response to concerns expressed by City Councilors at the June 27, 2011, hearing, on July 14, 2011, AT&T also provided the City Council with noise and radio frequency studies to confirm AT&T's representations that there would be no increase in noise at the sites and that the radio frequency emissions at ground level would be well below the FCC's standard for Uncontrolled/General Public Maximum Permissible Exposure.

90.     AT&T has not received any new information or correspondence with respect to the Moody and Wyman applications and has set forth, in writing, its position that the new Shot Clock date is August 28, 2011 with respect to those applications.

91.     With respect to AT&T's final three applications, AT&T finally received the necessary signatures on two of the remaining Prospectuses -- those relating to the Turner and Winter applications. With respect to the eighth application, Bear Hill, AT&T has still not received the required sign-off from the Building Department, which has now had the Prospectus for approximately five months. Once the Building Department signs off, the City's procedures require that AT&T still needs signatures from the Engineering Department relative to Bear Hill.

92.     On July 1, 2011, AT&T filed its three remaining applications with the City Clerk.

**Waltham's History of Hostility to Wireless**

93.     After receiving AT&T's June 6, 2011 letter concerning the FCC's Shot Clock Ruling, Councilor Tarallo was quoted in a local newspaper as saying that counsel for AT&T "is indicating that he's not using a shot clock, he's using a gun and trying to aim it at the city council." Tarallo also claimed that: "[t]his city council has never gone to federal court on a case taken by any petitioner because we've been able to work cooperatively with all of the vendors within this city."

94.     Tarallo's claim of complete cooperation is demonstrably false. As Tarallo well knows, he and the City Council were previously sued by another wireless services provider Sprint Spectrum L.P. ("Sprint") with respect to the City's refusal to accept Sprint's application for a wireless telecommunications facility to be located on the same 200' tower at issue in AT&T's pending Sachem application. See *Sprint Spectrum L.P. v. The City of Waltham, et al.*, United States District Court for the District of Massachusetts, Civil Action No. 01-10542MLW.

In addition to Tarallo, Councilors Marchese, Brasco, Giordano, Marcou, and Stanley were also named defendants in the action brought by the undersigned counsel on behalf of Sprint.

95.     The next year, in 2002, the City sought to lease property improved with a City-owned water tower.  Water towers are frequently used by wireless telecommunications providers because they can attach antennas to the sides rather than constructing a new stand alone facility. The City was approached by wireless telecommunications companies interested in placing antennas on the unused water tower, but the City nonetheless decided to tear down the water tank, thus losing for its citizens the income it might have derived from the wireless telecommunications companies.

96.     In yet another egregious example of the City's hostility to wireless telecommunications, in 2008, the Committee, of which Tarallo is chair, denied a request to install wireless telecommunications equipment on top of an office building.  As here, Tarallo argued that the application was flawed from the start because it did not begin with a legal public hearing and noted that the abutters' list, which was prepared with the assessor's office, was not certified by the assessor's office.  Tarallo also complained that there were outdated signatures on the Prospectus, notwithstanding the fact that the City Clerk had advised the applicant that it could move forward with the older signatures because the site plan had not changed.

97.     As a result of the Committee's denial, the applicant asked to withdraw the application.  However, the City Council **refused to allow the withdrawal and instead denied the application outright**, which prevented the applicant from correcting any of the alleged issues with the application or from filing a new application for at least one year.

## D.   COUNTS

### (Count I – Violation of Telecommunications Act of 1996)

98.     AT&T hereby adopts and incorporates by reference, as if fully stated herein, the allegations contained in paragraphs 1 through 97.

99.     The TCA governs the regulation of the placement, construction, and modification of personal wireless service facilities, and under the Supremacy Clause, preempts other regulations affecting such facilities to the extent that such other regulations conflict with federal law.

100.    The FCC has the authority to execute and enforce the TCA and prescribe such rules and regulations and issue orders necessary to carry out the provisions of the TCA.

101.    AT&T's applications constitute requests to provide "personal wireless services" within the meaning of the TCA, and, as such, are entitled to the protection of the TCA.

102.    However, in contravention of the TCA, the Defendants have engaged in over eight months of delay and procedural maneuvering that effectively circumvents the TCA and the Shot Clock Ruling.

103.    The delays in accepting and processing AT&T's applications violate the TCA's prohibition of unreasonable delay.

104.    Accordingly, the Defendants are in violation of the TCA and further delay in the approval of AT&T's applications should be denied by the Court on that basis.  Further, the Court should exercise its power to issue an order commanding the City Council to issue the special permits.

(Count II – Declaratory Judgment, 28 U.S.C. § 2201)

105.    AT&T hereby adopts and incorporates by reference, as if fully stated herein, the allegations contained in paragraphs 1 through 104.

106.    The Prospectus pre-application barriers to AT&T's filing of special permit applications constitute a violation of the TCA as described above.

107.    An actual controversy exists due to the unreasonable delay inherent in the Prospectus process and the City Council's procedural delay tactics.

108.    Article VI, Clause 2 of the United States Constitution, commonly known as the Supremacy Clause, provides, in relevant part, that "[t]his Constitution, and the laws of the United States which shall be made in pursuance thereof … shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding."

109.    Under the TCA, local zoning ordinances apply only to the extent that they do not interfere with other provisions of the Act.

110.    AT&T is entitled to a declaration that the Defendants have violated the provisions of the TCA because of the unreasonable delay in light of the *de minimis* modifications proposed in AT&T's applications.

111.    AT&T is entitled to a declaration that the Prospectus process is preempted by the TCA.

112.    In addition to a declaratory judgment, AT&T is entitled to such other and further relief as may be available, under 28 U.S.C. § 2202, including, but not limited to, injunctive relief.

(Count III – Declaratory Judgment, 28 U.S.C. § 2201)

113.    AT&T hereby adopts and incorporates by reference, as if fully stated herein, the allegations contained in paragraphs 1 through 112.

114.    Section 10.56 of the Ordinance provides that **any** modification to a wireless telecommunication facility requires a special permit.

115.    Notwithstanding the *de minimis* nature of the changes, the Building Inspector and the City have consistently taken the position that a building permit is not a permissible way to make even the smallest of modifications, and that a special permit is required.

116.    An actual controversy exists due to the unreasonable delay inherent in the special permit process.

117.    Article VI, Clause 2 of the United States Constitution, commonly known as the Supremacy Clause, provides, in relevant part, that "[t]his Constitution, and the laws of the United States which shall be made in pursuance thereof … shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding."

118.    Under the TCA, local zoning ordinances apply only to the extent that they do not interfere with other provisions of the Act.

119.    AT&T is entitled to a declaration that the special permit requirement in section 10.56 of the Ordinance is  preempted by the TCA.

120.    In addition to a declaratory judgment, AT&T is entitled to such other and further relief as may be available, under 28 U.S.C. § 2202, including, but not limited to, injunctive relief.

## E.   PRAYERS FOR RELIEF

WHEREFORE, AT&T respectfully requests the following relief:

1.   A preliminary injunction allowing AT&T to install at risk all of the equipment for which approval is sought in AT&T's applications.

2.   A declaration and judgment that the Defendants' action violated the TCA and is therefore void and invalid;

3.   A declaration and judgment that the Defendants' actions are preempted by the TCA and are therefore void and invalid;

4.   A declaration and judgment that the Section 3.5 of the Ordinance is preempted by TCA and are therefore void and invalid as to AT&T;

5.   A declaration and judgment that the Section 10.56 of the Ordinance is preempted by the TCA and are therefore void and invalid as to AT&T;

6.   A declaration of the respective rights and obligations of the parties as to the Defendants' action and AT&T's entitlement to the relief it requested;

7.   An order mandating that the City Council grant approval of the application for a special permit;

8.   An expedited review of the matters set forth in this Complaint;

9.   Such other and further relief as the Court may deem just and proper.

**NEW CINGULAR WIRELESS PCS, LLC,**

By its attorneys,


/s/ Amanda Buck Varella
Wayne F. Dennison (BBO #558879)
Amanda Buck Varella (BBO #641736)
BROWN RUDNICK LLP
One Financial Center
Boston, MA  02111
July 26, 2011                            (617)856-8200

## **VERIFICATION**

I, Brian Allen, hereby verify under pains and penalties of perjury that I have personal knowledge of the foregoing averments, that the factual statements contained herein are, to the best of my knowledge, true and that I believe to be true all statements made on information and belief.

_____

NEW CINGULAR WIRELESS PCS, LLC

By its agent:  Brian J. Allen
(hereunto duly authorized)

1838747 v 5